978 A.2d 736

**John Wesley RAY**

v.

**STATE of Maryland.**

**No. 145, Sept. Term, 2008.**

Court of Appeals of Maryland.

Aug. 27, 2009.

George E. Burns, Jr., Assistant Public Defender (Nancy S. Forster, Public Defender, of Baltimore), on brief, for appellant.

James E. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, of Baltimore), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

In this case, we are asked to interpret the words "extraordinary cause" embedded in Section 3–107 of the Criminal Procedure Article, Maryland Code (2001, 2007 Supp.), which mandates dismissal of charges against a defendant, who, having

been found incompetent to stand trial, remains so for a period of time, such as five years in the present case.[1] Specifically, John Wesley Ray, Petitioner, was indicted in the Circuit Court for Harford County for attempted first-degree murder, attempted second-degree murder, first-degree assault and second-degree assault. On January 2, 2002, Ray was adjudged incompetent to stand trial and was committed to the Department of Health and Mental Hygiene, which designated him to the Clifton T. Perkins Hospital in Jessup.[2] After five years elapsed, Ray filed a motion to dismiss the charges pursuant to

---

1. Section 3–107 of the Criminal Procedure Article, Maryland Code (2001, 2007 Supp.), states:

    (a) *Dismissal of charges for certain crimes after certain time.*—Whether or not the defendant is confined and unless the State petitions the court for extraordinary cause to extend the time, the court shall dismiss the charge against a defendant found incompetent to stand trial under this subtitle:

    (1) when charged with a capital offense, after the expiration of 10 years;

    (2) when charged with a felony or a crime of violence as defined under § 14–101 of the Criminal Law Article, after the lesser of the expiration of 5 years or the maximum sentence for the most serious offense charged; or

    (3) when charged with an offense not covered under paragraph (1) or (2) of this subsection, after the lesser of the expiration of 3 years or the maximum sentence for the most serious offense charged.

    (b) *Requirement of notice and hearing.*—Whether or not the defendant is confined, if the court considers that resuming the criminal proceeding would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court shall dismiss the charge without prejudice. However, the court may not dismiss a charge without providing the State's Attorney and a victim or victim's representative who has requested notification under § 3–123(c) of this title advance notice and an opportunity to be heard.

    (c) *Requirement of notice to victim on request.*—If charges are dismissed under this section, the court shall notify:

    (1) the victim of the crime charged or the victim's representative who has requested notification under § 3–123(c) of this article; and

    (2) the Criminal Justice Information System Central Repository.

    Statutory references to Section 3–107 throughout are to the Maryland Code (2001, 2007 Supp.), unless otherwise noted.

2. Section 10–406 of the Maryland Health–General Article, Maryland Code (1982, 2005 Repl.Vol.) places administration of the Clifton T. Perkins Hospital Center under the direction of the Department of Health and Mental Hygiene. According to the Department of Health and Mental Hygiene, the Hospital "receives patients requiring psychiat-

Section 3–107(a), and a hearing was held in the Circuit Court for Harford County, during which psychiatrists testified that Ray remained "dangerous," but could be restored to competency to stand trial in the relatively near future. The judge denied Ray's motion to dismiss his charges, because he found that the seriousness of Ray's charges, coupled with his dangerousness and restorability, constituted "extraordinary cause" to extend the time within which the charges were to be maintained. Ray appealed and petitioned this Court for immediate review, whereupon we granted the petition and issued a writ of certiorari, *Ray v. State*, 406 Md. 744, 962 A.2d 370–71 (2008), prior to any proceedings in the Court of Special Appeals, to address the following question:

> Did the trial court err in finding "extraordinary cause" to refuse to dismiss an incompetent defendant's charges without any "extraordinary" predicate?

We shall hold that the judge erred in finding "extraordinary cause," under Section 3–107 of the Criminal Procedure Article, and shall reverse the denial of Ray's motion to dismiss.[3]

## I. Background

On February 27, 2001, John Wesley Ray was indicted by a Harford County Grand Jury for attempted first-degree mur-

---

ric evaluation who have been accused of felonies and have raised the Not Criminally Responsible (NCR) defense and/or their Competency to Stand Trial is in question ...; accepts, by transfer, felony inmates from correctional facilities who meet the criteria for involuntary commitment (IVA) ...; and accepts patients from other State Regional Psychiatric Hospitals whose behavior is violent and aggressive." Maryland Department of Health and Mental Hygiene, Clifton T. Perkins Hospital Center, http://www.dhmh.state.md.us/perkins/ (last visited Aug. 21, 2009). The Department of Health and Mental Hygiene describes the "mission" of the facility as follows:

> The mission of Clifton T. Perkins Hospital Center (CTPHC) is to perform timely pretrial evaluations of defendants referred by the judicial circuit of Maryland, provide quality assessment of and treatment for all patients, and provide maximum security custody of patients to ensure public safety.

*Id.*

3. We have not been asked to address the constitutionality of the "extraordinary cause" predicate and so leave that issue to another day.

der, attempted second-degree murder, first-degree assault and second-degree assault, stemming from a confrontation with a girlfriend. Prior to trial, Ray entered a plea of not criminally responsible ("NCR"), after which he was ordered to undertake a psychiatric evaluation to determine if he was competent to stand trial. In January of 2002, a judge concluded that Ray was not competent to stand trial, and Ray was committed to the Department of Health and Mental Hygiene, which ultimately placed him at Clifton T. Perkins Hospital in Jessup, Maryland, where he has since lived. Annual evaluations related to Ray's incompetency have been filed each December with the Circuit Court.

On January 5, 2007, five years after Ray had been found incompetent to stand trial, Ray's counsel filed a motion to dismiss criminal charges pursuant to Section 3–107(a) of the Criminal Procedure Article, in which he argued that the charges had to be dropped because of the passage of time. The State opposed the motion to dismiss, arguing that the charges needed to be extended, because Ray continued to be both incompetent and dangerous, but restorable—conditions constituting "extraordinary cause." A hearing to address whether the charges should be maintained because of "extraordinary cause" was held in October of 2007, during which the State offered the testimony of four forensic psychiatrist experts,[4] as well as two law enforcement officers and the victim's husband, in addition to hundreds of letters written by Ray while he was committed.

Dr. Angela Kim–Lee, Director of Pretrial Services at Clifton T. Perkins Hospital, testified that Ray had been diagnosed as a paranoid schizophrenic, that in the early stages of his treatment, Ray was under the belief that the FBI and different government agencies were conspiring against him, but that with treatment, in particular with antipsychotic medications, including Rispiridone and Geodon, his paranoid beliefs

---

4. The Court accepted the qualification of each of the State's four expert witnesses, and Ray's counsel did not challenge the experts' qualifications.

had diminished over time. She stated that in 2005, she had believed that he was competent to stand trial and took a first step by referring him for a pretrial criminal responsibility evaluation, but that during the course of that evaluation, he had expressed paranoid beliefs that the victim of the crime was still trying to poison him; she explained that the pretrial evaluator ultimately determined that he remained not competent to stand trial. As of September 2007, Dr. Kim–Lee considered Ray to be "dangerous," based on prior hospitalization for mental illness, stemming from violent encounters based on paranoid beliefs and his conduct while at Perkins:

There were other hospitalizations prior to his admission at Perkins. Two specific hospitalizations at Fallston General Hospital, one in 1993 and one in 1994, and the hospital records from those admissions talk about Mr. Ray having an explosive temper, having periods of rage followed by memory loss. Two admissions occurred in the context of dangerous behavior. The first one was in 1993 was a result of Mr. Ray attacking his brother-in-law and then claiming no memory of it. The second hospitalization was reported to be also in the context of him having violent thoughts towards others. There were charges of assault and battery pending against him at the time as a result of the fight and there was also a charge of sexual assault against his daughter who was apparently two at that time. So there is a history of psychotic or of psychiatric hospitalizations that predates the current admission in Perkins.

His admission in Perkins as we all know precipitated from the instant offense which Mr. Ray in our opinion continues to hold paranoid, delusional beliefs about the victim in the offense. . . . He has in the past acted on his symptoms by example of not resulting in his current arrest for the instant offense but he has also wrote numerous letters to various government agencies, various officials articulating his paranoid, delusional beliefs. He has a history of becoming agitated and threatening. He has contacted the victim during his hospitalization despite being told and aware that he is not only to do that against her wishes and the victim

has perceived these contacts as threatening and has come to the point over the years that the hospital has had to restrict him from phone use. There is also an incident in which he had his mail supervised because he was sending unwanted communications or letters to a female at Howard County Detention Center.

She also evaluated Ray as lacking "insight into his mental illness" and opined that he would discontinue medication if released from Perkins. Dr. Kim–Lee testified further that in her opinion Ray was "restorable" to competency through further treatment and trials of antipsychotic medications:

> It's my opinion Mr. Ray is considered restorable. He has a history of being restored in our Hospital, certainly responding, improving with treatment and there is no reason to doubt that he would not respond to treatment. He has only had a limited trial of a couple antipsychotic medications. There are a number of other alterative medications out there in addition to his current treatment plan he is getting.

> \* \* \*

> [B]ased on his history of treatment .... he has demonstrated significant improvements from his previous mental state with the medication and so I think it's reasonable clinically to expect that he would continue to improve with continued treatment and trials of medication.

Dr. Ana N. Cervantes, a staff psychiatrist at Perkins and supervisor of those patients at the Institution who had been determined to be incompetent to stand trial, testified that she agreed with Dr. Kim–Lee that Ray was both "dangerous" and "restorable" and specifically expounded on the "restorable" characterization:

> [Dr. Cervantes]: [T]he basis for my opinion [that Ray is restorable] is twofold. He has been restored in the past. In 2005 he was at the point where he was able to meet the standard for competent to stand trial. That wasn't sustained, but he was able to get there. And also it is my opinion that after speaking with him in October that he was

certainly able to provide a large amount of relevant information, show that he was able to cooperate and assist in his defense more so than he had demonstrated in previous reports and it's my opinion that part of the reason we have not been able to obtain as much information as we would like is his lack of cooperation as opposed to psychotic symptoms only. . . . I mean that Mr. Ray chooses who he wishes to speak with and who he doesn't wish to speak with.

\* \* \*

[State's Attorney]: And do you have any other basis for your opinion he is restorable to competency in the reasonably near future?

[Dr. Cervantes]: Well, I believe there is evidence that he is responding partially to his current treatment regiment and also in reviewing his medication he has received while at Clifton Perkins he certainly has not had an exhaustive trial of all the available antipsychotic medications or combinations thereof. He has only been on two antipsychotic medications. I believe currently he is on one. The[re] was a very recent medication change and I understand that there are plans to change medications at this particular time again. So certainly he has not had what we would consider an exhaustive trial of all the available medications that are used to treat this illness.

The State then called Dr. Marshall Smith, a fellow in forensic psychiatry at Perkins Institute, who had conducted a competency evaluation of Ray in August or September of 2007. Dr. Smith testified that in his opinion Ray was both "dangerous" and "restorable":

[State's Attorney] And based on your evaluation or your review of his records and his treatment plan do you have an opinion to a reasonable degree of medical certainty as to whether or not he is dangerous?

[Dr. Smith]: That opinion is that he is dangerous . . . I base that on the history of prior dangerousness as Dr. [Kim-]Lee and Dr. Cervantes already mentioned. I also base that on

his active psychosis which mainly includes delusional thoughts or false fixed beliefs as mentioned previously and the fact that he continues to think that he is involved with criminal proceedings and helping folks to solve crimes, writing letters and things of that nature even after being directed on multiple occasions not to do that.

[State's Attorney]: When you attempted to conduct your interview with him how many times did you attempt that?

[Dr. Smith]: I went to him on three separate occasions. The first time he actually did come into the room and he told me he just didn't want to talk to me and he left. The second time when I wanted to speak to him we never made it into the room. He saw me and said I'm not talking to you, and just turned and walked [a]way. That was probably I would say maybe three or four days after the first attempt. Then about a week later after the second attempt I tried again and got the same response. He saw me and just refused to even talk to me at all and just turned and walked away.

[State's Attorney]: What, if any, impact did your inability to actually speak with Mr. Ray have on your ability to come to the conclusion or have the opinion as to his competency?

\* \* \*

[Dr. Smith]: I mean it's always better to be able to in my opinion to interview somebody yourself so that you can formulate your own opinion. I think that's always best. But I think if the documentation is done well I think that you can, we often rely on history and what's documented to help us to make a decision and make more accurate diagnoses on a patient. Especially if the patient is not able to really give a verbal account then the chart is often very helpful because you have got a very clear day-to-day documentation over time about a particular person's illness.

Dr. Smith then testified with respect to Ray's "restorability":

[State's Attorney]: And do you have an opinion to a reasonable degree of medical certainty as to whether or not Mr.

Ray can be restored to competency within the reasonably near future?

[Dr. Smith]: Yes, I do.... I think that Mr. Ray can be restored.

[State's Attorney]: In the relatively near future?

[Dr. Smith]: I do.... I base that on just the fact that he was restored to competency back in 2005 when Dr. [Kim-]Lee evaluated him and that was her opinion then. I know there was a period of time when Mr. Ray refused to take medication but now he is back on medication. Even though he refused to talk to me, Dr. Cervantes did speak to him for over and hour on the 2nd of October and she felt like he really understood a lot of court procedures and thought he was well on his way. I also agree with what Dr. Cervantes says about Mr. Ray's choice on who he wants to speak to. He chooses not to speak to me and I don't know why he chooses not to speak to me but I think that with his cooperation and his continued compliance with his medication that he can be restored to competency.

Dr. Paolo J. Negro, Ray's treating psychiatrist at Perkins, testified about the specific manifestations of Ray's paranoid schizophrenia:

[State's Attorney]: Now, since July of 2006 when you became his treating psychiatrist what has been the course of his treatment for this particular psychiatric condition?

[Dr. Negro]: There are several aspects. You can take a perspective of how his behavior is in the unit. You can take an aspect of how his fundamental symptoms are. I would say that he responded partially to the medications. He was taking a high dose of Rispiridon when it started. And he was not as intense and angry and agitated at the time of the admission; however, he was too delusional in the sense he was still having fixed false ideas of multiple situations that were also described in his admission. So to the year he mostly presented with this partial improvement but with evidence of continuing symptomology.

So, for example, he still maintains he is a psychic detective, sends letters, you know, sends multiple letters to Mr. Ashcroft. I am not sure when was his last letter to the President, but he claims that he is helping solving crimes and that he has these powers that are partially blocked by medication use. He claims or he states that he has this Indian blot [sic] and he calls himself by an Indian name and so this actually continues in spite of treatment.

\* \* \*

[State's Attorney]: What does this tell you, the fact that he still has these delusions, what does this tell you about his overall diagnosis?

[Dr. Negro]: What happens is the following. All these delusions belong to the same thing which is the schizophrenia. He is very guarded about what he experiences. He got better enough not to tell what he is really thinking but to give little bits of it. So, for example, he tells me that he is a psychic detective and he can get very upset if we contradict him with that information. But in the last couple of times that we met he denied, for example, that he was Eagle Feather or some name like that from the Indian perspective although in the last letter from September that he sent out he was signing himself with that name.

So what that means is that all these delusions belong to the same process like it's all part of the same pie and the treatment helps him to understand that people find them part of his mental illness but he absolutely does not believe that this is a mental illness. He just gets better enough to be able to portray himself as showing improvement in order to ask for his release basically. I am not sure if that's the question that you asked but that's what I observed through the year.

With respect to whether Ray responded to antipsychotic mediation, Dr. Negro opined:

[Dr. Negro]: He shows improvement. What happens is some people, they never really respond. So we have pa-

tients at Perkins at the present time who we give high doses of antipsychotics and never get better, tell you they are still hearing voices, they don't get better, they have the delusions and the delusions are very active and they keep acting upon the delusions. They cannot control themselves. They cannot even prevent themselves from talking about the delusions. Then you have some people that of course they get much better right away from medication.

He is in the middle. He shows response with the Rispiridon, not enough to be able to be released safely from the hospital but enough to not be a danger to others while in the hospital and enough to recognize that other people find this quite psychotic and that he should not talk about it because if he talks about it people would think he has a real problem and they believe he is crazy. So he has this understanding but that does not mean that he truly believes that he has a mental illness. He thinks he has psychic powers and the whole treatment is just impeding the psychic powers. '

Dr. Negro finally testified that in his opinion Ray was restorable with treatment with the drug Clozapine, but indicated, however, that Ray had not begun using the drug because Ray's brother's consent, as his guardian, needed to be secured. Negro characterized restoration of Ray to competency as dependent on the administration of the appropriate medication:

I am very concerned and I think that the treatment, I think it's not fair to not extend the time because, number one, he refused medication until 2004 and I think that we still have a treatment that is very specific and very effective that we did try which is the Clozapine.

I will say this. I have no problem to say he has 90 percent or more chance of being competent on Clozapine.

\* \* \*

I believe he will be restored to competency. I think that it's just a matter to adjust and give the right medication to him. I will tell you this—to my understanding, and I hope I

am not forcing a wrong number here, but when people go through the system in the Hospital the reincarceration rate is one percent. The system is you start in a locked maximum security unit and then you go to medium. The medium is like a regular, locked unit in any other place. Then you go to minimal. Then you learn how to cope, you learn how to behave and then you go out in the community. When people go through this whole system they tend not to come back and what I believe for him is that when he gets the right medication he will go to medium, he will be able to progress and he will eventually be able to not only be released but not come back to the Hospital.

Dr. Negro, like the other experts, also testified that he believed that Ray was "dangerous," to himself and others, specifically the victim:

I am very concerned about the victim. To a certain degree he could be a danger to himself also and I will explain. There is a specific concern. What's going to happen, and I can guarantee this, he is going to get released, he is going to stop his medications, he is going to get to the victim's house. Now, I cannot guarantee he will get into the house or he will find the house, but he is going to try and find the house. He is going to try, he is going to do it. It is in his mind. He is still delusional about the victim, not only about the victim but if you look at the letter of September, if I remember the date September maybe 12, he is asking for his biological children to be brought here today and he calls. There is an older letter he calls himself I think Eagle Feather and he gives Indian names to the kids. So the kids are part of the delusion so he may very well go after the kids as well.

\* \* \*

And then he can be a danger to himself because you don't know what's going to happen to you, you know, how people are going to react to that. Even if he shows up on her doorstep what's going to be the response, or at the school.

I don't know. So I predict that. I am specifically predicting that.

* * *

He says that the treatments are a hindrance against his powers. . . . A hindrance, something that goes against his powers, his psychic powers. His psychic powers are there to help people to solve crimes. I asked him specifically are you going to go and get [the victim] after you leave and he told me no because I am going to be solving crimes.

* * *

So the delusions that caused the instant offense are still there. Therefore, I can predict very well that there will be enactment on the same delusions. And I don't want to see neither her, her family or him getting hurt in the situation.

The State also called the husband and representative of the victim, who testified about Ray's attempts to contact his wife from Perkins Hospital, both by telephone and through letters addressed to their home and her workplace. Specifically, he testified that after Ray had contacted his residence, he had called Perkins on several occasions to get Ray to stop. On one such occasion, the husband explained, he spoke to Ray, and Ray asked him, "what are you going to do when the Pagans come knocking at your door," which he acknowledged frightened him and his family.

Lisa Marts, the Assistant State's Attorney responsible for initiating the charges against Ray, also testified to the effect that she had received hundreds of letters from Ray over the years, in many of which Ray purported to have investigative leads to unsolved crimes; all of the letters were admitted into evidence. Ms. Marts further testified that recently she had perceived the tone of the letters to be more threatening. Detective Tom Walsh, who knew Ray as a result of Ray's prior work as a police informant, took the stand and explained that he also had received many of Ray's letters.

Closing arguments ensued, primarily addressing the question of whether "extraordinary cause" existed to extend the time to maintain Ray's criminal charges within the strictures of Section 3–107. The State argued that "extraordinary cause" was extant, because Ray's charges were severe, Ray posed a danger to himself and to society, and he could be restored to competency in the near future with treatment at Perkins Hospital.

Ray's counsel argued that before the adoption of current Section 3–107(a) in 2006, Section 12–106(a)(2)(ii) of the Health–General Article governed dismissal of criminal charges, and permitted, but did not require, a judge to dismiss charges if competency was not restored, and only after five years had elapsed.[5] Ray argued that amended Section 3–107(a) of the Criminal Procedure Article, mandated that a judge dismiss charges after five years. Regarding whether there existed "extraordinary cause" to warrant denial of a motion to dismiss, Ray's counsel argued that the plain meaning of the word *extraordinary* is, "cause beyond what is ordinary, usual or common place," and that there is nothing out of the ordinary about patients in Perkins being both

---

**5.** Section 12–106 of the Health–General Article, Maryland Code (1982, 2000 Repl.Vol.) stated:

(a) *In general.*—Whether or not the defendant is confined, if the court considers that resuming the criminal proceeding would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court may dismiss the charge. However, the court may not dismiss a charge:

(1) Without providing the State's Attorney and victim who has filed a notification request form under Article 27, § 770 of the Code advance notice and opportunity to be heard; and

(2)(i) Until 10 years after the defendant was found incompetent to stand trial in any capital case; or

(ii) Until 5 years after the defendant was found incompetent to stand trial in any other case where the penalty may be imprisonment in the State penitentiary.

(b) *Notice of dismissal.*—If charges are dismissed under this section, the court shall notify:

(1) The victim of the crime charged who has filed a notification request form under Article 27, § 770 of Code; and

(2) The Central Repository of the Criminal Justice Information System.

dangerous and restorable. Ray's counsel explained that neither *restorability* nor *dangerousness* are helpful to inform what is *extraordinary*, because a prerequisite to commitment in Perkins is commission of a violent crime or posing a safety risk to the public, and it is Perkins' goal to treat patients to "restore" them to competency to stand trial.[6] Thus, Ray was like all the other patients at Perkins and there was nothing at all "out of the ordinary."

The judge reserved ruling and, thereafter, issued a written opinion denying Ray's motion to dismiss and granting the State's petition to extend time. The judge explored the meaning of *extraordinary* through dictionary definitions, as well as through the history of the enactment of Section 3–107 and a discussion of cases where, in other circumstances, Maryland appellate courts had opined on the meaning of the word:

> One of the cardinal principles of statutory construction is that we give words their ordinary dictionary definitions unless the context in which they are used in the statute indicates otherwise.
>
> ***Chapter 353*** of the ***Laws of Maryland 2006*** (HB795) was a comprehensive rewriting of Sections ***3–104—3–108*** of the ***Laws of Maryland*** dealing with incompetency and criminal responsibility. The purpose clause of this bill, as it relates to ***Section 3–107,*** states: "... requiring a court to dismiss, under certain circumstances, a certain charge after passage of certain time periods; requiring a certain notifica-

---

**6.** For this proposition, Ray's counsel cited some of the prerequisites for civil commitment set forth in Section 10–617(a) of the Health–General Article, Maryland Code (1982, 2005 Repl.Vol.):

(a) In general.—A facility or Veterans' Administration hospital may not admit the individual under Part III of this subtitle unless:
(1) The individual has a mental disorder;
(2) The individual needs inpatient care or treatment;
(3) The individual presents a danger to the life or safety of the individual or of others;
(4) The individual is unable or unwilling to be admitted voluntarily; and
(5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

tion to a certain person who has filed a certain request for notification ... and generally relating to criminal defendants and incompetency and criminal responsibility." The legislature did not define, for the purposes of the change, its intent to ascribe to the word "extraordinary" anything other than its normal meaning. *Webster's New Collegiate Dictionary* describes extraordinary as "going beyond what is usual, regular or customary; exceptional to a very marked extent." *Black's Law Dictionary, 5th Edition,* goes much further. *Black's* defines extraordinary as:

> "Out of the ordinary; exceeding the usual, average or normal measure or degree; beyond or out of the common order of rules; not usual, regular, or of a customary kind; remarkable, uncommon; rare ... the word is both comprehensive and flexible in meaning. Beyond or out of the common order or method, exceeding the ordinary degree; not ordinary; unusual; ... extraordinary designates an accident, casually, occurrence or risk of a class or kind other than those which ordinary experience or prudence would foresee, anticipate or provide for ..."

*Black's* also defines a number of terms using extraordinary. Such as extraordinary care, extraordinary circumstances, extraordinary damage, extraordinary hazard, and extraordinary risk among others. *Black's* defines extraordinary risk as: "an extraordinary risk is one lying outside of the sphere of the normal, arising out of conditions not usual in the business. Is one which is not normally and necessarily incident to the employment ..." *Black's* further defines cause as, among other things, a reason for an action or condition or a ground of a legal action. It is thus apparent that the use of the phrase "extraordinary cause" in *Section 3–107(a)* may be stated as something out of the ordinary. The appellate courts of this State have from time to time opined, although in other contexts, what extraordinary means. In *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979), the Court of Appeals defined the term as: "... is cause beyond which is ordinary, usual or common place. It exceeds the common order of rule and is not regular or of

the customary kind" (285 Md. 310 at 319, 403 A.2d 356). Extraordinary cause is a higher standard that has to be determined by a trial judge based on the circumstances existent in the particular case. *See State v. Toney*, 315 Md. 122, 553 A.2d 696 (1989); *In re Ryan S.*, 139 Md.App. 94, 774 A.2d 1193 (2001); and *Guarnera v. State*, 20 Md.App. 562, 318 A.2d 243 (1974). These cited cases are in the context of speedy trial issues but are helpful in distinguishing between what is considered ordinary, usual or common place and what is extraordinary. It is perfectly clear that the State's burden under the current iteration of *3–107(a)* is to establish a higher standard—something out of the ordinary or exceptional.

The judge then held that "extraordinary cause" existed to extend the time governing the dismissal of Ray's criminal charges, because of Ray's dangerousness and restorability:

1. From the time he was found not competent to stand trial on January 2, 2002, until sometime in 2004, Mr. Ray refused treatment. It was only after a guardian was appointed for him (his brother) that he consented to any treatment via medication or other modalities. The hospital (Clifton T. Perkins) has to take steps to make sure that he takes his medication.

2. The underlying criminal charges involve an allegation by the State that Mr. Ray attempted to kill his then girlfriend. It has been made very clear to Mr. Ray that she wishes to have no contact with him. He has been told to refrain from any contact with her. As noted in his last evaluation report of September 12, 2007, Mr. Ray continued to send letters to the victim who is now married. In addition to writing letters to her, he has made some contact by telephone. At various times he has claimed that one of the reasons the underlying criminal case occurred was that his girlfriend and her mother had drugged him. In one of his letters to her dated January 29, 2007, Mr. Ray advised the victim that he had survived through it all despite the fact that she had lied about him. He told her that she had "now you turned into a witch and was now a true warrior."

The victim is now married. **Section 3–107** allows and indeed requires notice to a victim or victim's representative.... [T]he victim's current husband testified that the victim is still afraid of him. He described the letters and phone calls from Mr. Ray to the victim and related four telephone calls from Mr. Ray to the victim that were very disturbing to her.

3. Mr. Ray has written literally hundreds of letters to Detective Thomas Walsh of the Harford County Sheriff's Department, Lisa Marts, Esquire, the Assistant State's Attorney who was assigned to the case originally, the Attorney General of the United States, the United States Attorney for the District of Maryland, the Federal Bureau of Investigation and other members of the Harford County Sheriff's Department. I have carefully reviewed the letters which have been segregated by year. Some of them are very disturbing while others are somewhat innocuous. The letters illustrate the delusional nature of Mr. Ray. In some of his recent letters, he has demanded that he be provided with money and other things. Ms. Marts testified that she found some of the letters to be very threatening. A careful review of them leads me to concur with her observation.

4. All four of the psychiatrists from Clifton T. Perkins who testified agree that Mr. Ray presents a clear and present danger to himself and others as a result of his mental condition. The medication he is taking has had some positive effect. The doctors believe, however, that if Mr. Ray were to be released (these charges dismissed) he would not take his medication. They believe this to be the case because Mr. Ray at various times indicated that he does not believe that he is mentally ill and needs no treatment. Without treatment it is clear that his mental illness would likely be exacerbated. His delusions include the idea that he believes that he has "psychic powers" to solve crimes. Several years ago he was evidently of assistance to law enforcement in investigating some criminal offenses in Cecil County. While this may be true, his delusional state continues. The doctors feel so strongly about his condition that if

these charges were to be dismissed, they would immediately seek to obtain civil commitment.

5. As pointed out in his most recent evaluation dated September 12, 2007, he continues to display psychotic behavior; continues to be delusional; and has no insight into his illness. His current delusional symptoms were described as "prominent." One of his treating psychiatrists, Dr. Smith, in commenting on Mr. Ray's dangerousness, described him as exhibiting active psychotic symptoms that influence his behavior.

The psychiatrists all agree that he continues to be "restorable." That means that the doctors believe that with continuing treatment he may progress to the point where he is competent to stand trial. That has not as yet occurred. Even if it were to reach that point, there would then have to be a separate evaluation with regard to criminal responsibility which, of course, has not yet occurred because of his status.

Accordingly, the judge denied Ray's motion to dismiss and granted the State's motion to extend time to maintain Ray's criminal charges. Ray appealed, and we granted Ray's petition for certiorari, prior to any proceedings in the Court of Special Appeals.

## II. Standard of Review

In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay*, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Barbre*, 402 Md. at 172, 935 A.2d at 708; *Kelly*, 397 Md. at

420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County,* 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Barbre,* 402 Md. at 173, 935 A.2d at 708–09; *Kelly,* 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett,* 392 Md. 411, 427, 897 A.2d 228, 237 (2006); *Davis v. Slater,* 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004). "Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language." *Robey v. State,* 397 Md. 449, 454, 918 A.2d 499, 502 (2007), citing *Stanley v. State,* 390 Md. 175, 185, 887 A.2d 1078, 1084 (2005). "In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments." *Id.*

██ If, however, the language is subject to more than one interpretation, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. *Barbre,* 402 Md. at 173, 935 A.2d at 709; *Kelly,* 397 Md. at 419–20, 918 A.2d at 482; *Smack v. Dep't of Health & Mental Hygiene,* 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003). When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the "purpose, aim, or policy of the enacting body," *Serio v. Baltimore County,* 384 Md. 373, 390, 863 A.2d 952, 962 (2004); *Drew v. First Guar. Mortgage Corp.,* 379 Md. 318, 327, 842 A.2d 1, 6 (2003), and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Bowen v. City of Annapolis,* 402 Md. 587, 613–14, 937 A.2d 242, 258 (2007); *Magnetti v. Univ. of Md.,* 402 Md. 548, 565, 937 A.2d 219, 229 (2007); *Clipper Windpower, Inc. v. Sprenger,* 399 Md. 539, 554, 924 A.2d 1160, 1168 (2007).

### III. Discussion

The sole issue in this case is whether "extraordinary cause" existed to extend the time for Ray's criminal charges or

whether the charges should have been dismissed, because five years had elapsed since Ray was found not competent to stand trial.

"Extraordinary cause" is not statutorily defined, but we have in the past referred to it as, ". . . cause beyond which is ordinary, usual or common place; it exceeds the common order or rule and is not regular or of the customary kind." *State v. Hicks*, 285 Md. 310, 319, 403 A.2d 356, 361 (1979). Themes of rarity, irregularity and unusualness also pervade the definition of *extraordinary* in Merriam–Webster's Collegiate Dictionary 444 (11th ed.2003) ("going beyond what is usual, regular, or customary; exceptional to a very marked extent."). The definition of extraordinary cause, however, does not appear to be in dispute, and we recognize that extraordinary means beyond that which is ordinary, usual or commonplace; what constitutes functionally as "extraordinary cause" remains the dilemma.

Ray's counsel argues that the standard of "extraordinary cause" must be measured within a context of violent offenders, who are incompetent to stand trial but capable of being restored to competency. Measured against this context, Ray's attorney asserts, Ray's situation is not extraordinary because committing a serious crime and being dangerous are prerequisites to admission at Perkins, and the mission of Perkins is to "restore" defendants to competency.

The State posits that "extraordinary cause" must be evaluated in light of problems that are implicated when serious criminal charges are dismissed against a defendant who poses a danger to society, to the victim and to the victim's family, but who arguably can be restored to competency to stand trial. In general, the State argues that protection of the public from Ray, and the fact that he is restorable, warrants a finding of "extraordinary cause." [7]

---

7. From the outset, we note that under Section 3–107 of the Criminal Procedure Article, any dismissal is without prejudice to the State reindicting and that civil commitment under Title 10 of the Health–

A review of the legislative history of Section 3–107 of the Criminal Procedure Article elucidates that such a finding was intended to be limited to only the rarest of circumstances and that neither the seriousness of the charge nor the dangerousness or restorability of the individual is solely determinative. Apparently, before 1967, there was no statute providing for dismissal of criminal charges against an individual who could not be restored to competency. Rather, if a defendant was adjudged incompetent to stand trial, he/she would be committed to an institution, and criminal charges would be stayed until such time as he/she could stand trial:

> Whenever any person charged with the commission of any crime, offense, or misdemeanor shall appear to the court or be alleged to be a lunatic or insane, or if the court shall have any reason to suspect that such person may be a lunatic or insane the court may cause the Department of Mental Hygiene to inquire whether such person is at the time of such inquiry insane or lunatic, or of such mental incapacity as to prevent such person from properly conducting his or her defense or advising as to the conduct of his or her defense; and if the Department of Mental Hygiene shall find that such person is at the time of such inquiry insane or lunatic [or incapable of conducting a defense] ... the court shall in its discretion direct such person to be confined in Spring Grove State Hospital, or such other institution as may be designated, from time to time, by the Department of Mental Hygiene for the care or treatment of the criminal insane, until he or she shall have recovered and shall stay the proceedings against such person until that time, and upon recovery the court shall proceed with the trial of the charge pending against such person.

Maryland Code (1951), Article 59, Section 8.

In 1967, Section 8 of Article 59 was repealed and re-enacted to include procedures prescribing dismissal of charges against a defendant who had been adjudged incompetent. Section

---

General Article, Maryland Code (1982, 2005 Repl.Vol.) is always a possibility.

8(b) of Chapter 709 of the Maryland Laws of 1967 permitted a judge to dismiss charges against a defendant who had not become competent, but only after 10 years had elapsed since the finding of incompetency in a capital case and 5 years had elapsed in all other cases punishable by imprisonment:

> Whether or not the defendant is confined, if the court is of the view that so much time has elapsed since the finding of incompetency that it would be unjust to resume the criminal proceedings, the court may dismiss the charge; provided, that in capital cases the court may not dismiss the charge until ten (10) years have elapsed from the date of the finding of incompetency and in all other cases punishable by imprisonment in the penitentiary the court may not dismiss the charge until five (5) years have elapsed from the date of the finding of incompetency. The Department of Mental Hygiene shall annually report to each court under whose commitment it may hold any person pursuant to this section a list of all such persons in its custody, along with any recommendations which it may deem appropriate.

\* \* \*

> The State's Attorney instituting the charges shall within thirty (30) days forward to the court and to the last counsel for each person charged his recommendation as to the disposition of charges against persons who, by reason of the length of their detention, might be eligible for release under this section.

1967 Maryland Laws, Chapter 709, Section 8(b). This language remained essentially the same until 1982,[8] when it was amended and re-codified by Chapter 24 of the Laws of 1982 as Section 12–105 of Health–General Article (1982), to provide:

---

8. In 1970, Chapter 407 of the Maryland Laws repealed Article 59 of the Maryland Code (1957, 1968 Repl.Vol., 1969 Supp.) in its entirety, removing the name "Lunatics and Insane" from the title and renaming the Article, "Mental Hygiene." Provisions governing dismissal of charges after adjudication of incompetency to stand trial remained unchanged.

Whether or not the defendant is confined, if the court considers that resuming the criminal proceeding would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court may dismiss the charge. However, the court may not dismiss a charge:

(1) Until 10 years after the defendant was found incompetent to stand trial in any capital case; or

(2) Until 5 years after the defendant was found incompetent to stand trial in any other case where the penalty may be imprisonment in the State Penitentiary.

As a result, until 2006, the dismissal of charges remained discretionary after the expiration of the requisite time period.[9]

---

**9.** The statute was amended during the period after its codification in the Health–General Article and before re-codification in the Criminal Procedure Article. In 1984, Section 12–105 of the Health–General Article was renumbered as Section 12–106 of the Health–General Article by Chapter 501 of the Maryland Laws of 1984. The only addition to the Section at that time was subsection (b), which stated that, "The Court shall notify the Central Repository of the Criminal Justice Information System any time charges are dismissed under this Section."

The language of the 1984 Act remained the same until the Victims' Rights Act of 1997, Chapter 311 of the Maryland Laws of 1997, was enacted by the General Assembly. Under that Act, which was intended, in part, to "require[ ] a commitment agency, under certain circumstances, to notify the victim of certain information and events concerning the defendant … [and to] prohibit[ ] the court … from dismissing a charge without providing the State's Attorney and a victim … advance notice and an opportunity to be heard," Section 12–106 of the Health–General Article, Maryland Code (1982, 2000 Repl.Vol.), was modified to reconcile its provisions, to state:

(a) *In general.*—Whether or not the defendant is confined, if the court considers that resuming the criminal proceeding would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court may dismiss the charge. However, the court may not dismiss a charge:

(1) Without providing the State's Attorney and victim who has filed a notification request form under Article 27, § 770 of the Code advance notice and opportunity to be heard; and

(2)(i) Until 10 years after the defendant was found incompetent to stand trial in any capital case; or

(ii) Until 5 years after the defendant was found incompetent to stand trial in any other case where the penalty may be imprisonment in the State penitentiary.

In 2001, the Legislature added a new Criminal Procedure Article to the Maryland Code, pursuant to Chapter 10 of the Maryland Laws of 2001, and Section 12–106 of the Health and Mental Hygiene Article was repealed and re-enacted as Section 3–107 of the Criminal Procedure Article. Five years later, the General Assembly enacted Chapter 353 of the Maryland Laws of 2006, to deal specifically with the dismissal of charges against defendants who had been adjudged incompetent:

> AN ACT ... FOR the purpose of ... authorizing the court to reconsider the question of whether a defendant is incompetent to stand trial at any time before final judgment ...; requiring a court to dismiss, under circumstances, a certain charge after passage of certain time periods ...; requiring a certain notification of [certain individuals]; and generally relating to criminal defendants and incompetency and criminal responsibility.

2006 Maryland Laws, Chapter 353.

The "Background" Section of the Senate Judicial Committee Floor Report to House Bill 795 discusses the impetus for the bill as a lawsuit initiated by numerous defendants previously adjudged incompetent to stand trial, in which they claimed violations of their due process rights under Article 24 of the Maryland Constitution Declaration of Rights,[10] as a result of their being held indefinitely in Department of Health and Mental Hygiene facilities, after having been adjudged incompetent:

---

(b) *Notice of dismissal.*—If charges are dismissed under this section, the court shall notify:
(1) The victim of the crime charged who has filed a notification request form under Article 27, § 770 of Code; and
(2) The Central Repository of the Criminal Justice Information System.

10. Article 24 of the Maryland Constitution Declaration of Rights states: That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

In August 2004, the Maryland Disability Law Center filed a law suit in the Circuit Court for Baltimore City on behalf of five individuals who were found incompetent to stand trial and committed to DHMH facilities for treatment to restore competency, alleging that commitment of defendants found incompetent to stand trial violated the defendant's rights under Article 24 of the Maryland Declaration of rights because it:

● allows people to be institutionalized who are charged with a criminal offense, but who are never going to be restored to competency to stand trial;

● allows for the commitment of people for treatment to restore competency to stand trial on misdemeanor charges beyond the maximum penalty that could have been received if convicted of the charges; and

● fails to provide for review by the courts.

According to the Mental Hygiene Administration (MHA), there are 100 people being held in MHA facilities [that] are not able to stand trial and doctors have determined that 12 of the detainees are not likely to become competent to stand trial. DDA estimates that 35 individuals being held in its facility are not able to stand trial. This population is not an annual occurrence, but has instead accumulated over time. This bill is the result of a workgroup convened during the 2005 interim, which included representatives of the Courts, the Office of the Public Defender, State's Attorneys', Department of Health and Mental Hygiene, the Office of the Attorney General, the Maryland Disabilities Law Center, Maryland Crime Victims Resource Center, and other interested groups and individuals. This bill represents a work-product that is the result of long discussion and compromise.

Senate Judicial Proceedings Committee Floor Report on HB 795, at 7 (2006).

As the Floor Report noted, numerous public interest groups, participating in workgroups, assisted in the process of developing the amendments to Sections 3–104 to 3–107 and 3–

123 of the Criminal Procedure Article, and various of the participants testified in favor of the bill. Representatives of the Maryland Disability Law Center provided written testimony noting that, "House Bill 795 provides the due process and equal protection that has been illegally withheld from [the class of individuals adjudged incompetent] for 34 years." The Mental Health Association of Maryland [11] also urged a favorable report on the Bill, focusing on the need to move nonviolent individuals out of institutions rather than permitting them to "languish" in facilities well beyond the maximum time that they could have served for their alleged crime. The Maryland Department of Disabilities, in written testimony, noted that "[p]eople who have psychiatric disabilities who find themselves involved with the courts should be assured that they will not be held as incompetent to stand trial for indefinite periods of time without the benefit of periodic review of their competency. This bill addresses that need." Of particular note, the Department of Health and Mental Hygiene, itself, strongly favored the bill, emphasizing the need for civil commitment proceedings when a defendant is adjudged incompetent to stand trial but not restorable:

> Under current law if a Court finds a defendant incompetent to stand trial and dangerous to self or person or property of others due to mental illness or mental retardation, the defendant may be committed to the Department until the Court finds the defendant is no longer incompetent to stand trial or is no longer, because of mental illness or mental retardation, a danger to self or others. At issue was whether an individual could remain committed to the Department as [incompetent to stand trial] for a period longer than the maximum sentence the Defendant would have served if they had been found competent and guilty. In

---

11. The Mental Health Association of Maryland describes its mission as "provid[ing] education and advocacy on behalf of individuals with mental illnesses so that they may reach their rightful place as participating, productive members of our community." MHAMD: Mental Health Association of Maryland, http://www.mhamd.org/ (last visited Aug. 21, 2009).

addition, it was legally debatable as to whether a Defendant could remain court committed to the Department for treatment indefinitely especially if it was it was not is [sic] likely the Defendant would become competent to stand trial in the foreseeable future. This bill was drafted to address these concerns.

\* \* \*

The bill provides that if an individual is found not competent due to mental illness and not likely to be restored to competency, the court may civilly commit the individual to a state psychiatric hospital if certain findings are made. The Department recommended the individual be returned to the State hospital for a commitment hearing before an Administrative Law Judge, pursuant to Health General Title 10. The individual therefore would be treated in an identical manner as other individuals presented for civil commitment.

Bill File, H.B. 795 (2006).

The Office of the Public Defender, in written testimony, explained that a change in the provisions of Section 3–107 was needed in light of the case of *Jackson v. Indiana*, 406 U.S. 715, 729, 92 S.Ct. 1845, 1854, 32 L.Ed.2d 435, 446 (1972), in which the Supreme Court held that it violates the equal protection and due process clauses of the Fourteenth Amendment for a State to hold an individual adjudged incompetent indefinitely. In *Jackson*, Jackson was a mentally impaired deaf mute who argued that his indefinite commitment to an Indiana state mental institution, after having been adjudged mentally incompetent to stand trial, amounted to a life sentence for a robbery. At the time, under the Indiana statute, if the court found that the defendant "has not comprehension sufficient to understand the proceedings and make his defense," trial was to be delayed indefinitely until such time as the defendant could stand trial. *Id.* at 720–21, 92 S.Ct. at 1849, 32 L.Ed.2d at 440–41. Jackson argued that he was denied equal protection, because civil commitment would have required the State to shoulder a greater burden to warrant detention, and due process, because he could be indefinitely

committed without the benefit of appropriate process. *Id.* at 723–24, 92 S.Ct. at 1850–51, 32 L.Ed.2d at 442–43.

The Court agreed with Jackson on both accounts and held that Indiana could not hold Jackson indefinitely under their criminal commitment statute. In ruling on Jackson's equal protection challenge, Justice Harry A. Blackmun, writing on behalf of the Court, recognized that Indiana's civil commitment statute would have required the State to make at least, "(1) a showing of mental illness and (2) a showing that the individual is in need of 'care, treatment, training or detention,'" and that with regard to detention a showing of "dangerousness" was required. *Id.* at 728–29, 92 S.Ct. at 1853, 32 L.Ed.2d at 445. He also noted that under the Indiana civil commitment statute, release was available, "when the individual no longer requires the custodial care or treatment or detention that occasioned the commitment, or when the department of mental health believes release would be in his best interests." *Id.* Based on this analysis, a unanimous Court concluded that mere pendency of criminal charges did not justify vastly different substantive and procedural rights that would have been afforded to Jackson had his commitment been in the civil context:

> The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release.

> As we noted above, we cannot conclude that pending criminal charges provide a greater justification for different treatment than conviction and sentence. Consequently, we hold that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by § 22–1209 or § 22–1907, Indiana deprived petitioner of

equal protection of the laws under the Fourteenth Amendment.

*Id.* at 729–30, 92 S.Ct. at 1853–54, 32 L.Ed.2d at 446 (footnote omitted).

Jackson's indefinite commitment also violated due process, the Court recognized, because Jackson had not been afforded a hearing to address the basis for holding him indefinitely:

> It is clear that Jackson's commitment rests on proceedings that did not purport to bring into play, indeed did not even consider relevant, *any* of the articulated bases for exercise of Indiana's power of indefinite commitment. The state statutes contain at least two alternative methods for invoking this power. But Jackson was not afforded any "formal commitment proceedings addressed to [his] ability to function in society," or to society's interest in his restraint, or to the State's ability to aid him in attaining competency through custodial care or compulsory treatment, the ostensible purpose of the commitment. At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.

*Id.* at 737–38, 92 S.Ct. at 1858, 32 L.Ed.2d at 450–51 (alteration in original) (footnote omitted). The constitutional standard they adopted was clear—a State could hold a defendant adjudged incompetent to stand trial, only for a "reasonable period" to determine if competency could be restored in the "foreseeable future":

> We hold, consequently, that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.

*Id.* at 738, 92 S.Ct. at 1858, 32 L.Ed.2d at 451.

In this context, Subsection (a) of amended Section 3–107 of the Criminal Procedure Article was added in 2006 as an entirely new section in the statute and required, rather than

permitted, a court to dismiss charges after the expiration of certain time-periods:

(a) Whether or not the defendant is confined and unless the State petitions the court for extraordinary cause to extend the time, the court shall dismiss the charge against a defendant found incompetent to stand trial under this subtitle:

(1) when charged with a capital offense, after the expiration of 10 years;

(2) when charged with a felony or a crime of violence as defined under § 14–101 of the Criminal Law Article, after the lesser of the expiration of 5 years or the maximum sentence for the most serious offense charged; or

(3) when charged with an offense not covered under paragraph (1) or (2) of this subsection, after the lesser of the expiration of 3 years or the maximum sentence for the most serious offense charged.

2006 Maryland Laws, Chapter 353. Subsection (b) of the statute retained some of the language of the former Section 3–107(a), and added that charges are to be dismissed without prejudice:

Whether or not the defendant is confined, if the court considers that resuming the criminal proceeding would be, unjust because so much time has passed since the defendant was found incompetent to stand trial, the court shall dismiss the charge without prejudice. However, the court may not dismiss a charge without providing the State's Attorney and a victim or victim's representative who has requested notification under § 3–123(c) of this title advance notice and an opportunity to be heard.

The modifications to Section 3–107 by Chapter 353 of the Laws of 2006 are a part of a comprehensive amendment to Title 3 of the Criminal Procedure Article, which is entitled "Incompetency and Criminal Responsibility in Criminal Cases." Section 3–106, notably, also was amended to mandate civil commitment when a judge determines that the defendant

is not restorable to competency. Subsections (a)-(e) of Section 3–106 state:

(a) *Release.*—Except in a capital case, if, after a hearing, the court finds that the defendant is incompetent to stand trial but is not dangerous, as a result of a mental disorder or mental retardation, to self or the person or property of others, the court may set bail for the defendant or authorize release of the defendant on recognizance.

(b) *Commitment.*—

(1) If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates until the court finds that:

(i) the defendant no longer is incompetent to stand trial;

(ii) the defendant no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others; or

(iii) there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

(2) If a court commits the defendant because of mental retardation, the Health Department shall require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs.

(c) *Reconsideration.*—

(1) To determine whether the defendant continues to meet the criteria for commitment set forth in subsection (b) of this section, the court shall hold a hearing:

(i) every year from the date of commitment;

(ii) within 30 days after the filing of a motion by the State's Attorney or counsel for the defendant setting forth new facts or circumstances relevant to the determination; and

(iii) within 30 days after receiving a report from the Health Department stating opinions, facts, or circumstances that

have not been previously presented to the court and are relevant to the determination.

(2) At any time, and on its own initiative, the court may hold a conference or a hearing on the record with the State's Attorney and the counsel of record for the defendant to review the status of the case.

(d) *Reconsideration.—Finding defendant not likely to become competent.*—At a competency hearing under subsection (c) of this section, if the court finds that the defendant is incompetent and is not likely to become competent in the foreseeable future, the court shall:

(1) civilly commit the defendant as an inpatient in a medical facility that the Health Department designates provided the court finds by clear and convincing evidence that:

(i) the defendant has a mental disorder;

(ii) inpatient care is necessary for the defendant;

(iii) the defendant presents a danger to the life or safety of self or others;

(iv) the defendant is unable or unwilling to be voluntarily committed to a medical facility; and

(v) there is no less restrictive form of intervention that is consistent with the welfare and safety of the defendant; or

(2) order the confinement of the defendant for 21 days as a resident in a Developmental Disabilities Administration facility for the initiation of admission proceedings under § 7–503 of the Health–General Article provided the court finds that the defendant, because of mental retardation, is a danger to self or others.

(e) *Applicability of Title 10 of the Health–General Article to civil commitment.*—The provisions under Title 10 of the Health–General Article shall apply to the continued retention of a defendant civilly committed under subsection (d) of this section.

Section 3–106 of the Criminal Procedure Article, Maryland Code (2001, 2007 Supp.).

In the present case, the Judge determined that Ray's dangerousness and ability to be restored to competency required, Ray's continued institutionalization beyond the prescribed five-year period, conceivably for an indefinite period. It is anomalous indeed, in light of the mandate for civil commitment of an incompetent defendant who cannot be restored, that Ray, who was identified as restorable, could be held indefinitely without a commitment proceeding.

■ In this regard, then, extraordinary cause must require more than dangerousness and restorability, in order to avoid the necessity of civil commitment that requires greater procedural protections. Dangerousness, the norm for defendants institutionalized at Perkins, cannot be viewed as extraordinary, especially because it is but one factor for civil commitment.[12] Restorability to competency, similarly, cannot consti-

---

12. As explained in subsection (e) of Section 3–106 of the Criminal Procedure Article, Maryland Code (2001, 2007 Supp.), the procedures for civil commitment are set forth in Title 10 of the Health–General Article, Maryland Code (1982, 2005 Repl.Vol.). Section 10–617(a) of that Article sets forth five factors the State must prove to civilly commit an individual, one of which is dangerousness:

   (a) *In general.*—A facility or Veterans' Administration hospital may not admit the individual [involuntarily] unless:
   (1) The individual has a mental disorder;
   (2) The individual needs inpatient care or treatment;
   (3) The individual presents a danger to the life or safety of the individual or of others;
   (4) The individual is unable or unwilling to be admitted voluntarily; and
   (5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

   Section 10–706 of the Health–General Article (1982, 2005 Repl.Vol.) also notably sets forth the procedure for creating a treatment and rehabilitation plan for a civilly committed individual. Under the plan, treatment goals are set with the help of the individual:

   (a) *Plans required.*—
   (1) Except as provided by paragraph (2), promptly after admission of an individual, a facility shall make and periodically update a written plan of treatment for the individual in the facility, in accordance with the provisions of this subtitle.
   (2) Promptly after admission of an individual to a psychosocial center, the center shall make and periodically update a written plan of rehabilitation for the individual in the facility, in accordance with the provisions of this subtitle.

tute "extraordinary cause," especially when restorability, a desirable characteristic, could result in indefinite institutionalization, without procedural protection. In holding that dangerousness and restorability cannot constitute "extraordinary cause," however, we recognize that under the statute the State may re-institute charges and that civil commitment proceedings may be initiated against Ray. Whatever decision is made, if any, the pending charges against Ray must be dismissed.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY HARFORD COUNTY.**

ADKINS, J., Dissents.

Dissenting Opinion by ADKINS, J.

I respectfully dissent from the majority opinion because, in my view, the Circuit Court did not err in finding "extraordinary cause to extend the time" under Maryland Code (2001, 2008 Repl.Vol.), Section 3–107 of the Criminal Procedure Article ("CP").

---

(b) *Rules and regulations.*—The Director shall adopt rules and regulations under this section that include:
(1) A description of the nature and content of plans of treatment; and
(2) Appropriate time periods for the development, implementation, and review of each plan.
(c) *Participation by individual.*—An individual shall:
(1) Participate, in a manner appropriate to the individual's condition, in the development and periodic updating of the plan of treatment; and
(2) Be told, in appropriate terms and language, of:
(i) The content and objectives of the plan of treatment;
(ii) The nature and significant possible adverse effects of recommended treatments;
(iii) The name, title, and role of personnel directly responsible for carrying out the treatment for the individual; and
(iv) When appropriate, other available alternative treatments, services, or providers of mental health services.

Preliminarily, I briefly recap the facts [1] that led the Circuit Court to its conclusion that there was "extraordinary cause," which included the following:

♦ For two years of the five-year period, Ray refused medicine to treat his mental health. Perkins hospital must still take steps to ensure he takes his mental health medicine.

♦ The underlying charges involve allegations that Ray tried to kill his girlfriend. Although he has been told not to contact the alleged victim, he continued to send letters to her during his stay at Perkins. In one letter he told her she had lied about him and she had "now you turned into a witch and was now a true warrior." The victim fears him. He has also called the victim, who was very disturbed by his calls.

♦ Ray has written hundreds of letters to law enforcement personnel reflecting his delusions, some of which were threatening.

♦ Ray presents a clear and present danger to himself and others as a result of his mental condition, which was diagnosed as schizophrenia. Although Ray has responded somewhat positively to his current medication, if he were released, he would likely not take his medicine.

♦ In his most recent evaluation in September 2007 he continued to be delusional, and has exhibited "active psychotic symptoms that influence his behavior."

♦ The four psychiatrists who examined him all agree that, with additional treatment using the drug Clozapine, he will likely be competent to stand trial in the foreseeable future.

As part of its analysis for concluding that there was, as a matter of law, no "extraordinary cause," the majority writes:

---

1. These facts and others were all set forth more fully by the majority.

[T]he Judge determined that Ray's dangerousness and ability to be restored to competency required Ray's continued institutionalization beyond the prescribed five-year period, conceivably for an indefinite period. It is anomalous indeed, in light of the mandate for civil commitment for an incompetent defendant who cannot be restored, that Ray, who was identified as restorable, could be held indefinitely without a commitment proceeding.

As an initial point, I disagree with the majority's characterization of Ray's confinement in an institution as for "an indefinite period" without a "commitment proceeding." Under CP Section 3–106, once a court decides, "after a hearing," that an individual is "incompetent to stand trial and, because of . . . a mental disorder, is a danger to self or the person or property of another" the court may commit the person to an institution. And, under subsection (c) of Section 3–106, after such commitment the court is required to hold a hearing *every year* to determine whether the person still meets that criteria.

More importantly, I do not share the majority's view that the Circuit Court's finding of extraordinary cause creates an anomaly.[2] Indeed, what is anomalous is the comparison, applying the *majority's* holding, between what happens to: (i) an incompetent and dangerous defendant needing inpatient care who is *not* likely to be restored to competency in the foreseeable future, and (ii) an incompetent and dangerous defendant needing inpatient care who *is* likely to be restored in the foreseeable future.[3] Let me explain.

Under CP Section 3–106(d), the court must commit the "incompetent and not restorable" person, but the statute

---

**2.** The majority sees an anomaly in that Maryland Code (2001, 2008 Repl.Vol.), Section 3–106 of the Criminal Procedure Article ("CP") mandates civil commitment for a person who is incompetent, dangerous, and cannot be restored, but criminal-type commitment for a person who can, in the foreseeable future, be restored to competency to stand trial.

**3.** I assume, in both cases, that the individual is unwilling to be voluntarily committed, and there is no less restrictive alternative.

contains no directive about what should be done with the "incompetent yet restorable" person.[4] Nor have I found any provision addressing how to treat this person elsewhere in the Criminal Procedure Article or in Title 10, Part III of the Health–General Article (Involuntary Admissions). Without any mandate that this "incompetent yet restorable" person be committed, civil commitment of the person is optional, and dependent on initiation of civil commitment proceedings by a person or institution with a legitimate interest. *See* Maryland Code (2000, 2005 Repl.Vol.), Section 10–614 of the Health–General article (addressing who may file an application for involuntary admission of an individual to a facility).

In my view, *this* is an anomaly because the prospect of achieving competency to stand trial in the foreseeable future does not render a person any less dangerous, or less in need of current commitment to an institution.[5] Thus, I conclude that the legislature's failure to include any *mandate* in CP Section 3–106 to civilly commit this "incompetent yet restorable" person, or otherwise address this situation, means that it did not anticipate this situation arising often. Because the legislature did not consider this situation to be an ordinary one that would often arise, I deduce that it did not intend to exclude this set of circumstances from the meaning of "extraordinary cause to extend the time" before mandatory dismissal under CP Section 3–107(a). Without extending the pending criminal charges, civil commitment is the only option,

---

4. This is assuming the CP Section 3–106(d)(1) findings are made. The required findings are:

    (i) the defendant has a mental disorder;

    (ii) inpatient care is necessary for the defendant;

    (iii) the defendant presents a danger to the life or safety of self or others;

    (iv) the defendant is unable or unwilling to be voluntarily committed to a medical facility; and

    (v) there is no less restrictive form of intervention that is consistent with the welfare and safety of the defendant[.]

5. "Incompetent to stand trial" simply means "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." CP § 3–101(f).

and I emphasize that it is optional, not mandatory. Moreover, I see nothing in the law which guarantees that there will be no gap between the present commitment and a civil commitment.

In addition to Ray's dangerousness and restorability, we also should consider that, although five years have passed since his original commitment, Ray has recently written threatening letters to the victim of his alleged assault with the intent to murder, and that the victim fears him. If charges were to be dismissed, and Ray released for as little as one day, it is entirely possible that he could go straight to the victim's house or workplace and inflict harm on her. He has also written hundreds of letters to the prosecutor in his case, which have recently become more threatening.

The majority relies on the notion that dangerousness and restorability cannot be "extraordinary" because:

> [E]xtraordinary cause must require more than dangerousness and restorability, in order to avoid the necessity of civil commitment that requires greater procedural protections. Dangerousness, the norm for defendants institutionalized at Perkins, cannot be viewed as extraordinary, especially because it is but one factor for civil commitment.

While dangerousness may be the norm for defendants at Perkins, there is no showing that the normal Perkins resident is also one who, after five years, has sufficient improvement so as to be restorable to competency in the foreseeable future.

Perkins psychiatrists have identified a specific medicine that they believed could improve Ray's mental capacity to such point that he would be competent to stand trial, but cannot administer that medicine until Ray's brother, his legal guardian, consents to such treatment. The Circuit Court found credible the psychiatrists' testimony that if he "were to be released (these charges dismissed) he would not take his medication" because he does not acknowledge his illness. As a consequence, "his mental illness would likely be exacerbated." It found credible their testimony that Ray "presents a clear and present danger to himself and others[.]" All of

these factors just mentioned contributed to the Circuit Court's conclusion that there was "extraordinary cause."

Finally, I point out that Ray does not fit within the intended protections sought by the Maryland Disability Law Center and others in promoting the formulation and passage of CP Section 3–107, which are set forth in the majority opinion. As the majority details more fully, the impetus for the bill was to protect people:

- who are never going to be restored to competency to stand trial
- who are committed beyond the maximum penalty that could have been imposed if convicted
- whose detainment has no review by the courts

Ray simply does not fit this description. Further, as the majority records, the Mental Health Association of Maryland "urged a favorable report on the Bill, focusing on the need to move non-violent individuals out of institutions rather than permitting them to languish in facilities well beyond the maximum time that they could have served for their alleged crime." The continued detention of Ray, who is considered violent and dangerous, and who is subject to an annual hearing by the court, is not inconsistent with the goals of any of these organizations.